UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| KRISTOPHER TURNER, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| v. | ) ) | No. 07 C 2511 |
| ADIDAS PROMOTIONAL RETAIL OPERATIONS, INC., | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) |  |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kristopher Turner ("Turner") filed this action against his former employer, Defendant Adidas Promotional Retail Operations, Inc. ("Adidas"). Turner alleges that Adidas interfered with his rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and retaliated against him for exercising those rights when it terminated his employment. In addition, Turner alleges that Adidas violated the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 *et seq.* ("COBRA") by failing to notify him of his rights to extended medical coverage following his termination. Finally, Turner brings a claim for intentional infliction of emotional distress ("IIED") under Illinois law. Defendant now moves for summary judgment on all three counts of Plaintiff's complaint and, for the reasons stated here, the motion is granted.

## BACKGROUND

The following facts are set forth in the parties' Local Rule 56.1 statements and responses, and are not in dispute, unless otherwise indicated. Where a party's response to a Local Rule 56.1 statement of fact does not directly contradict the fact in question and the underlying support for the fact is sound, the court deems that fact admitted.

Turner worked in the Adidas retail store in Aurora, Illinois from April 27, 2004 through June 22, 2006. He began his employment as a temporary, part-time worker on the store's sales floor and became a full-time employee in July 2004. (Def.'s Local 56.1(A)(3) Statement of

Uncontested Material Facts in Support of Its Motion for Summary Judgment (hereinafter "Def. LR 56.1 Stmt.") ¶¶ 3-4.) Some time before February 2006, Turner was transferred to another full-time position in the store's stockroom and at the time of his discharge held the title of "stockroom associate." (Def. LR 56.1 Stmt. ¶ 5; Turner Dep. 10; Sullivan Dep. 37.) As a stockroom associate, Turner typically worked from 8:00 a.m. to 3:00 or 4:00 p.m., Monday through Friday. (Def. LR 56.1 Stmt. ¶ 8.)

On February 1, 2006, a ladder fell and struck Turner on the head while he was working in the stockroom. The extent of Turner's resulting injury is unclear. Turner characterizes his condition as a "severe closed head injury," without citation to any extrinsic evidence such as medical records or a physician's report. (Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts That Require Denial of Defendant's Motion For Summary Judgment (hereinafter "Pl. 56.1 Stmt. of Additional Facts.") ¶ 4.) It is undisputed that the injury caused Turner to seek repeated leaves of absence from work. The amount of time off he requested is not entirely clear from the record, but appears to have begun no later than May 1, 2006 and continued through June 14, 2006. Each time Turner sought leave, he furnished a note from a physician, explaining his need to be excused from work. (Def. LR 56.1 Stmt. ¶¶ 7, 9; Turner Dep. 14, 19-20, 21-22, 99, 123-26; Turner Dep. Exs. 2, 13, 14, 15, 16.) The amount of leave time sought in these notes is unclear, but the final note requested one week. Each time Turner or one of his physicians submitted a note to Adidas, his request for time off was granted. (Def. LR 6.1 ¶ 9.) In addition, Adidas reduced Turner's hours following the accident so that he could attend doctors' appointments and physical therapy sessions. (Pl. 56.1 Stmt. of Additional Facts ¶ 11.)

When Adidas grants a leave of absence from work due to illness or injury, the employee bears the responsibility under company policy of notifying Adidas whether he plans to extend the leave or return to work. (Def. LR 56.1 Stmt. ¶ 12; Meriwether Dep. 19, 23-24.) If an employee fails to notify Adidas, Adidas will attempt to contact the employee to ask whether he will be returning to

2

work or seeking a further leave of absence. (Def. LR 56.1 Stmt. ¶12; Meriwether Dep. 19, 23-24.) An employee who does not supply a physician's note seeking to extend his leave of absence is returned to the work schedule. (Def. LR Stmt. ¶ 12.) An employee who has been returned to the work schedule but does not show up for a scheduled shift may be treated as having abandoned his job. (Def. LR Stmt. ¶ 6, 12; Lewis Dep. 35-36; Meriwether Dep. 27-31, 29-40.) Defendant's employment handbook defines job abandonment (a bit awkwardly) as follows:

> Employees who do not show for their shift and fail to notify the manager within twenty-four hours and fifteen minutes of that shift, excluding days the store is closed, will have been assumed to have voluntarily quit without notice and is considered job abandonment.

(Def. LR 56.1 Stmt. ¶ 6; Adidas Retail Work Rules, Turner Dep. Ex. 7, § V.) As part of his initial training at Adidas, Turner received instruction regarding the company's employment policies, and Turner confirmed in his deposition that he had been informed of this policy. (Def. LR 56.1 Stmt. ¶ 6; Turner Dep. 103-104.)

Throughout his recovery and absence from work, either Turner or one of his physicians provided Adidas with physician's notes requesting medical leave of absence from work. (Def. LR 56.1 Stmt. ¶ 9.) The total period of these requested absences is, as stated, unclear. The parties agree, however, that on May 1, 2006, Adidas received a note from Dr. Edward Blumen stating that Turner should not return to work for one week, and an unspecified number of doctors' notes after that date, continuing through June 7, 2006. (Pl. LR 56.1 Stmt. of Additional Facts ¶¶ 14, 16, 17; Def. Resp. to Pl. LR 56.1 Stmt. of Additional Facts ¶ 16.) Upon the expiration of the leave period covered by each note, Debbie Sullivan ("Sullivan"), Turner's store manager, contacted Turner to let him know that he would be returned to the schedule unless he provided another note requesting to further extend his leave. (Def. LR 56.1 Stmt. ¶ 13.) Sullivan also testified that continuing into early June 2006, she called Turner each week when he did not appear at work. (Sullivan Dep. at 75) Turner himself testified that after Ms. Sullivan received a note from his doctor, she would call

3

him to confirm that the note had been received and that his leave was approved (Turner Dep. 28-29); although he later submitted an affidavit in which he denied that Adidas's employees contacted him each time his medical leave was extended, he did not identify any occasions on which Sullivan failed to contact him other than on dates after June 15, 2006. (Turner Aff., Ex. A to Pl. LR 56.1 Resp. ¶¶ 9, 12.)

Jamie Meriwether, a benefits manager with Adidas, testified that on several occasions during the five-month period between Turner's injury in February 2006 and his discharge in June 2006, she called Turner and left messages asking that he contact her about requesting a leave of absence. (Def. LR 56.1 Stmt. ¶ 10; Meriwether Dep. 20-21.) Meriwether testified that Turner neither returned her calls nor completed the requested paperwork. (Def. LR 56.1 Stmt. ¶ 27; Turner Dep. 20-21; Meriwether Dep. 19-21.) Turner denies that Meriwether ever contacted him about completing FMLA paperwork, and it is undisputed that he did not submit any such request. (Pl. LR 56.1 Resp.¶ 10.) Nevertheless, Adidas did treat Turner's absences from February 2006 through his termination in June 2006 as FMLA leave, and all of his requests for time off accompanied by a physician's note were granted on that basis. (Def. LR 56.1 Stmt. ¶ 27; Turner Dep. 20-21; Meriwether Dep. 19-21.)

If Adidas has any specific written policies relating to the FMLA, they do not appear in the record. In response to a question about Adidas's FMLA policy, Meriwether testified that "Employees need to request leave of absence," and, "If I learn if there is a specific instance, I attempt to contact the employee to file for leave of absence." (Meriwether Dep. 19.) Regarding continuing FMLA leave, Meriwether testified, "You [the employee] have to show proof that it's continued." (*Id.* 23.) If an employee fails to furnish proof from a doctor of his need for leave, according to Meriwether, "we go the extra step and contact the employee to give them the opportunity to provide it." (*Id.* 23.) Further, "[i]f an employee does not return to work, nor produces documentation, I instruct the managers to get in touch with them not once, not twice, but three

4

times. And if they don't return on their scheduled return to work, they have voluntarily resigned." (*Id.* 23-24.) Meriwether stated that she instructed Sullivan to contact Turner "two, three, four" times regarding the extension of his FMLA leave (*id.* 24); precisely when she issued these instructions is not clear from the record.

On June 7, 2006, Adidas received a final note from Dr. Dennis Groothuis, Turner's treating neurologist, requesting an extension of Turner's leave of absence through June 14, 2006. (Def. LR 56.1 Stmt. ¶ 15; Turner Dep. 22; Turner Dep. Ex. 2; Sullivan Dep. 73-74.) Neither Plaintiff nor his doctors provided further medical support for continued leave. (Def. LR 56.1 Stmt. ¶ 17, citing Sullivan Dep. 65, 68-69; Meriwether Dep. 35.) Plaintiff denies this, but the material he cites–his own affidavit–states only that he notified Sullivan in a telephone conversation in "early June 2006" that his "medical leave was being extended on a week to week basis." (Turner Aff. ¶ 7.)

Sullivan testified that on June 15, 2006 she contacted Turner to inform him that without a further physician's note, he would be added to the schedule for the upcoming week. (Def. LR 56.1 Stmt. ¶ 16; Turner Dep. 24-25, 37, 132-33.) Sullivan noted in a "Separation Checklist" dated June 22, 2006 that Plaintiff advised her during this conversation that "his release was going to be extended." (Def. LR 56.1 Stmt. ¶ 16; Sullivan Dep. 75-77; Sullivan Dep. Ex. H.) Turner himself did not recall this conversation in his deposition, but admitted that it could have occurred. (Pl. LR 56.1 Resp. ¶ 16a; Turner Dep. 24-25, 131-33; Turner Ex. A; Sullivan Dep. 79-81.) In fact, however, Turner did not provide a subsequent physician's note, did not contact Adidas after the expiration of the June 7, 2006, and did not appear or call in for his scheduled shift on June 21, 2006. (Def. LR 56.1 Stmt. ¶ 17; Turner Dep. 37, 132-33; Turner Dep. Ex. 18; Sullivan Dep. 65.)

Beginning on May 17, 2006, Meriwether documented Turner's absences as a performance issue. (Pl. 56.1 Stmt. of Additional Facts ¶ 32; Ex. K, 0140.) Later, on May 22, 2006, Meriwether recommended that Plaintiff be "written up" for missing work because, she asserted, "he does have the work release." (Pl. 56.1 Stmt. of Additional Facts ¶ 29; May 22, 2006 e-mail, Ex. F, to Pl. LR

56.1 Stmt. of Additional Facts.) On May 24, 2006, Sullivan asked Meriwether if Plaintiff could be terminated for his absences. (Pl. 56.1 Stmt. of Additional Facts ¶ 31; May 24, 2006 e-mail, Ex. J to Pl. LR 56.1 Stmt. of Additional Facts.) On June 12, 2006 and June 13, 2006, Meriwether described Turner as "non-compliant" for his failure to schedule a CAT scan that had apparently been requested, and in one text conversation, referenced his injury as a "non-injury." (Pl. LR 56.1 Stmt. of Additional Facts ¶ 12, 13; e-mail and text messages, Ex. G and Ex. H to Pl. LR 56.1 Stmt. of Additional Facts.)

Prior to discharging Turner, Meriwether contacted Elizabeth Rende ("Rende"), a workers' compensation adjuster at Adidas, to ask whether any additional physician's notes had been received to excuse Plaintiff from work. (Def. LR 56.1 Stmt. ¶ 21; Meriwether Dep. 27.) Rende reported that she had called Dr. Groothuis' office and his nurse indicated that the doctor had not issued any additional physician's notes after June 7, 2006. (Def. LR 56.1 Stmt. ¶ 21; Meriwether Dep. 31-35, 44-46; Meriwether Decl. ¶¶ 9, 10.) As a result, on June 22, 2006, Meriwether made the decision to discharge Turner for job abandonment. (Def. LR 56.1 Stmt. ¶ 17-21.)

According to Turner's deposition testimony, he had a phone conversation with Sullivan in early June 2006 regarding the extension of his leave until further notice and thereafter did not attempt to contact Adidas until mid-September. (Pl. LR 56.1 Resp. ¶19; Tuner Dep. 24-25; 131-33; Tuner Ex. A.) Turner stated that he believed either Dr. Groothuis or his nurse would continue to submit physician's notes to Adidas on his behalf. (Def. LR 56.1 Stmt. ¶ 23; Turner Dep. 24-25, 131-33, Turner Ex. A, B.) Turner claims that he did not learn of his June 22, 2006 discharge until September 22, 2006, when he contacted Adidas's corporate offices with an insurance question. (Def. LR 56.1 Stmt. ¶ 22.)

Adidas asserts that after Plaintiff's discharge, on June 30, 2006, its third-party insurance company, Great-West, sent Turner a COBRA notice outlining his eligibility for continuing health benefits. (Def. LR 56.1 Stmt. ¶ 28.) Turner admitted that he had previously received mail from

6

Great-West at the mailing address Great-West used to send the COBRA notice. (Def. LR 56.1 Stmt. ¶ 30; Turner Dep. 25-26, 129.) And, although he denies receiving a COBRA notice from either Adidas or Great-West, Turner concedes that he was not regularly checking his mail or living at the mailing address on record with Adidas at the time. (Pl. LR 56.1 Resp. ¶ 28b disputing Fact ¶ 28; Turner, 26-27, 129; Turner Ex. A, B.)

In Count III of his complaint, Turner alleged that his "wife gave birth to a newborn baby girl" immediately after Adidas terminated his employment. In his deposition, however, Turner explained that as of late June 2006, he was merely engaged to Kim Dacas, who was not living with Turner at the time and did not give birth to their child until October 2006. (Def. 56.1 ¶¶ 33, 34; Pl. LR 56.1 Resp. ¶ 36.)

In his deposition, Turner admitted to a prior felony conviction in 2000 for retail theft. (Turner Dep. 8.) When he completed his application for employment in 2004, Turner had denied any felony convictions within the previous seven years. (Turner Dep. 90-91; Turner Dep. Ex. 5; Lewis Decl. ¶ 3.) As part of the application, Turner acknowledged that he had read and understood that he would be subject to discipline, including termination, for any failure to "completely and honestly" provide information. (Pl. LR 56.1 Rep. ¶ 44.) Adidas attests that it first learned of Turner's conviction during his January 17, 2008 deposition and would not have hired him had this information been properly disclosed in the application. (Lewis Decl. ¶ 5.)

## **DISCUSSION**

A court will grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage in the proceedings, the court does not weigh the evidence presented, but merely determines whether any genuine issues exist and require a trial. *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007). The nonmoving party is entitled to all reasonable inferences that can

be drawn from the record.  *Freeland v. Enodis Corp.*, 540 F.3d 721, 737 (7th Cir. 2008).  The nonmoving party must, however, also identify, "with reasonable particularity," the evidence on which it relies, and the court need not "scour the record" searching for a genuine issue for trial.  *Winters*, 498 F.3d at 744.  Neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor evidence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), justifies denial of a motion for summary judgment.

**Count I: Turner's Claims under the FMLA**

Turner's complaint alleges two violations of the FMLA.  First**,** Turner claims that Adidas interfered with his rights under the FMLA by failing to notify Turner that he needed to "recertify" his FMLA leave or to grant him the statutorily mandated 15 days to cure any defects in his medical "certification" before terminating his employment on June 22, 2006.  Second, Turner alleges that Adidas discharged him for attempting to exercise his rights under the FMLA.  Am. Compl. ¶¶ 48, 49. For the reasons discussed below, Turner has failed to meet his burden of showing that Adidas interfered with his substantive rights or to establish a prima facie case for retaliatory discharge under the FMLA.  Summary judgment for Adidas on Count I is therefore appropriate .

    **A.**    **Interference with Turner's FMLA Rights**

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1).  To prevail on a claim for interference with his substantive rights under the FMLA, Turner must establish, by a preponderance of the evidence, that Adidas denied him an entitlement under the Act.  *Kauffman v. Federal Express* Corp., 426 F.3d 880, 884-85 (7th Cir. 2005) (citing *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997)).  Turner claims that in terminating his employment, Adidas deprived him of his right to notice that he must submit certification for the continuation of his FMLA leave and his right to cure any defect in certification within 15 days of his

8

employer's request.

Under the FMLA, the employee has the initial duty of notifying his employer that he has a condition that qualifies him for FMLA leave. *Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 953 (7th Cir. 2004). This duty is not particularly onerous:

> [T]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave. He doesn't have to write a brief demonstrating a legal entitlement. He just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave.

*Id.* The employee need not mention the FMLA or even be aware of its existence when making his request for leave. 29 C.F.R. § 825.303(b); *Gilliam v. United Parcel Service, Inc.* 233 F.3d 969, 971 (7th Cir. 2000). Once an employee notifies his employer of a probable basis for FMLA leave, it is the employer's duty to request any information necessary to confirm the employee's entitlement to that leave. *Aubuchon*, 359 F.3d at 953. An employer has the option of requiring an employee to validate his request for FMLA leave with a medical certification of his condition (for example, through a note from his treating physician), and can require recertification "on a reasonable basis." 29 U.S.C. § 2613(a), (e); 29 C.F.R. § 825.305(a); *Stoops v. One Call Communications, Inc.,* 141 F.3d 309, 312 (7th Cir.1998). If the employer chooses to require certification, the FMLA "does not require the employer to request medical documentation on a particular form," but the initial request for certification must be in writing and must notify the employee of the consequences of failing to submit proper, timely certification. *Rager v. Dade Behring, Inc.*, 210 F.3d 776, 778 (7th Cir.2000); 29 C.F.R. § 825.305. If the employee's health condition was unforeseeable, the employer must give the employee at least 15 days to respond. *Id.* Where leave has already begun at the time the employer seeks certification, the request must be mailed to the employee's address of record. 29 C.F.R. § 825.300(c)(1)(ii). Thereafter, requests for further certification may be oral. 29 C.F.R. § 825.305(a).

Adidas admits that it treated Turner's absence as leave under the FMLA, despite Turner's

9

failure to fill out paperwork to that effect. Def. LR 56.1 ¶ 27. There is thus no dispute that Turner was on FMLA leave through June 14, 2006, the date his final medical excuse from work expired. It is likewise undisputed that Turner did not specifically request FMLA leave or complete any paperwork requesting leave, other than the continued submission of doctors' notes. Meriwether testified that she attempted to contact Turner by phone several times during his leave of absence to have him submit appropriate documents but received no response. Turner denies receiving such calls. There is no evidence that Adidas ever mailed Turner any notice of a requirement for certification, as mandated by the FMLA.

Adidas's witnesses testified that under the company's internal policy, an employee on an excused leave of absence is expected to notify Adidas upon the expiration of the excused period whether they intend to prolong their leave or return to work. (Meriwether Dep. 19, 23-24.) If an employee fails to contact Adidas, it is Adidas's policy to contact the employee to notify him that he will be returned to work unless the employee indicates that he plans to extend his leave. (*Id.*) With the single exception of the June 15, 2006 phone call, Turner does not dispute that he was in regular contact with Sullivan regarding his absence from work: Sullivan testified that she contacted Turner both when the period specified in a doctor's note was about to expire and when a new note requesting leave was received and approved. (Sullivan Dep. 75-77.) Turner's repeated submission of physicians' notes seeking further leave time likewise demonstrate his understanding of this system. Turner himself confirmed this understanding in his deposition; he testified, "they said take the time I needed as long as I had a doctor's note." (Turner Dep. 21:5-6.)

After June 7, 2006, Adidas received no further doctors' notes regarding Turner's condition or his need for leave. Elizabeth Rende, Adidas's workers' compensation adjuster, advised Jamie Meriwether that she had contacted Dr. Groothuis' office, and the nurse confirmed that Turner's last medical note expired on June 14, 2006 and that the office had not issued any notes since June 7, 2006. (Def. LR 56.1 Stmt. ¶ 21; Meriwether Declaration, Ex. 6 to Def. LR 56.1 Stmt, ¶ 9.)

Based on the evidence in the record, Adidas did not formally comply with the FMLA's notice requirements regarding certification. There is no evidence that Adidas notified Turner in writing that it required certification or warned him of the consequences of failing to provide certification, as required under the Act. When Turner did not respond to oral requests that he complete the FMLA paperwork, Adidas chose to accept Turner's physician's notes as proof of entitlement to FMLA leave. Because Adidas did not furnish Turner with proper notice of its certification requirements, if any, Turner was arguably under no obligation to comply with those certification requirements when his last doctor's note expired.

At that time Turner was, however, still under an obligation to conform with the FMLA's requirement of providing reasonable notice to his employer that he was entitled to continued leave. On June 7, 2006, Turner furnished Adidas with a note from his physician excusing him from work until June 14, 2006. Turner was aware of the note's expiration date. On June 15, 2006, one of two events transpired: either Sullivan called Turner and he told her his physician would be seeking an extension of his leave (Sullivan Dep. 75-77), or Adidas did not contact Turner after the expiration of the June 7, 2006 note. (Turner Dep. 24-25, 37, 132-33.) Either way, an extension of leave from Turner's physician never arrived. Turner insists that he did at some point informed Adidas that his doctor would be extending his leave indefinitely, and Adidas quite reasonably contacted Dr. Groothuis when that extension failed to arrive. When it learned from Dr. Groothuis's nurse that no such extension had been or would be issued, Adidas had no further basis to believe that Turner qualified for FMLA leave. *See Stoops*, 141 F.3d at 313 (granting summary judgment in favor of employer where employee's stated reason for FMLA leave was contradicted by his physician's conclusion that his condition did not require him to miss work). In any event, even if Turner had no communication with Adidas between "early June" (when Turner claims he notified Sullivan of his need for an indefinite leave), and his termination on June 22, 2006, he was admittedly aware of the date on which the leave covered by his most recent doctor's note expired, of Adidas's policy of

returning employees to work absent further notice of intended leave time, and of Adidas's "job abandonment" policy. Adidas should not have to intuit from Turner's silence that he was entitled to leave even after his most recent medical excuse had expired. *See Gilliam*, 233 F.3d at 972 ("Nothing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans.") Despite Turner's arguments to the contrary, Adidas had every reason to believe Turner was no longer entitled to FMLA leave based on his doctor's confirmation, contradicting Turner's purported assertions, that no more notes would be provided.

The court notes, finally, that Adidas's apparent failure to notify Turner in writing of the need to recertify his medical condition demonstrably did not result in any loss of rights guaranteed by the FMLA. For the reasons described below, with respect to the COBRA notice, there is genuine reason to doubt that any such written notification would have reached Turner. More significantly, however, Turner claims he was not able to return to work for many weeks after June 2006. In his Statement of Additional Facts, Turner asserts that he saw Dr. Groothuis on July 18, 2006 and again on September 18, 2006. On each occasion, Turner claims, Dr. Groothuis told Plaintiff he was not yet able to return to work. (Pl. LR 56.1 Stmt of Additional Facts ¶¶ 24, 25.) At no point has Turner suggested he was capable of returning to work at Adidas before September 2006, at least eighteen weeks after Turner had begun his leave. An employee unable to return to work after the twelve weeks of FMLA leave is not protected by the FMLA and is not entitled to return to work. *See* 29 C.F.R. §§ 825.214(b), 825.216(d). Thus, as several courts have concluded, an employee's rights under the FMLA are not violated when the employee is terminated but would not have been able to return to work after the required twelve weeks of leave. *See, e.g., Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 784-85 (6th Cir. 1998); *Pontolillo v. St. Vincent Health, Inc.*, No. 06 CV 1509-WTL-TAB, 2009 WL 276784 (S.D. Ind. Feb. 4, 2009*); Biggs v. Littlefuse, Inc.,* No. 03 CV 225, 2006 WL 3626758 (N.D. Ill. Dec. 8, 2006). Adidas's failure to notify Turner in

12

writing of what he already knew—that medical documentation was necessary in order to extend his leave—did not cost Turner any rights protected by FMLA.

Adidas is entitled to summary judgment on Count I of the complaint.

### B.     Retaliation for Exercise of FMLA Rights

Next, Turner asserts that Defendant terminated him in retaliation for taking FMLA leave. A plaintiff can establish a claim for retaliatory discharge under the FMLA through either the direct or indirect method of proof.  *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004)  To prove his claim using the direct method, Plaintiff must provide either direct evidence that "without reliance upon inference or presumption" will prove the necessary employer intent, or circumstantial evidence that "allows the trier of fact to *infer* intentional discrimination by the decisionmaker."  *Id. See also Ridings v. Riverside Medical Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) ("[a] plaintiff can prevail under the direct method by showing an admission of discrimination or by constructing a convincing mosaic of circumstantial evidence" that allows an inference of intentional discrimination) (quotations omitted)).  Under the indirect method, a plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) he was subjected to an adverse employment action; (3) he was performing his job in a satisfactory manner; and (4) he was treated less favorably than any other similarly situated employee who did not engage in such activity.  *Buie*, 366 F.3d at 503.  As Turner points out, the Seventh Circuit has acknowledged that the *McDonnell-Douglas* proof framework should be adapted to the type of case presented.  *Id.*  ("In some instances . . . the *McDonnell-Douglas* approach may be a poor fit for the case, or the plaintiff may wish to introduce other kinds of evidence that also may give rise to an inference of discrimination.") *Sattar v. Motorola*, 138 F.3d 1164, 1169 (7th Cir. 1998).  Even under the flexible approach described in *Sattar*, the employee claiming discrimination must come forward with evidence that gives rise to the inference that the otherwise unexplained employment action was taken for a forbidden reason.  *Id.* at 1169.

Turner contends that he has met his burden under any version of this framework, but the

13

court disagrees. As discussed above, Turner offered no further medical excuses for his absence after June 14, 2006 and failed to comply with Adidas's absence notification policy, thereby precluding him from the protections of the FMLA after that date. Even assuming Turner was genuinely in the dark about Adidas's expectation that he would continue furnishing medical documentation for his need for leave, he is unable to demonstrate that Adidas's decision to terminate him was somehow retaliatory. His only effort to do so relies on statements in e-mail exchanges between Adidas managers suggesting that he should be penalized for absenteeism and a text message in which Meriwether expressed skepticism about the severity of Turner's injury. Whatever Meriwether or Sullivan may have suspected or believed about Plaintiff's condition, however, they took no action against him until after the expiration of the last week for which his doctor had provided a medical excuse from working. Thus, Turner has not rebutted Adidas's proffered legitimate, non-discriminatory reason for terminating his employment for job abandonment on June 22, 2006 : his failure to report to work following the expiration of his last physician's note. Up until the expiration of this final note, Adidas had freely granted his repeated requests for FMLA when accompanied by a doctor's note and made additional efforts to acquire a doctor's note after the expiration of the final note on June 14, 2006. Despite his admitted knowledge of the note's expiration, Turner failed to contact Adidas for over two months. Adidas has established the absence of any genuine dispute concerning Plaintiff's claim of FMLA retaliation and is entitled to summary judgment on this claim, as well.

### C. Defendant's After-Acquired Evidence Defense

Because the court grants summary judgment in Adidas's favor as to Turner's FMLA claims, it need not address Adidas's motion for partial summary judgment based on the misrepresentation in his employment application that he had not been convicted of a felony.

**Count II**: **Failure to Notify Defendant of COBRA rights**

Under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), group health plan

sponsors are required to provide notice to each qualified beneficiary who, as a result of a qualifying event, may be entitled to continued coverage. *See* 29 U.S.C. § 1161. Qualifying events include termination of employment for any reason other than gross misconduct. 29 U.S.C. § 1163(2). COBRA requires that the employer notify the plan administrator of the qualifying event within thirty days. 29 U.S.C. § 1166(a)(2). The plan administrator is then responsible for notifying former employees of their right to receive continuation coverage within fourteen days after it receives notice of the qualifying event. 29 U.S.C. § 1166(a)(1), (c).

The Seventh Circuit has not yet had occasion to address the form of notice that is appropriate or required under COBRA. Those courts that have specifically addressed COBRA's notice requirements have concluded that "'a good faith attempt to comply with a reasonable interpretation of the statute is sufficient' to satisfy COBRA requirements." *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 977 (N.D. Ill. 1998) (quoting *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1383 (10th Cir.1997)). Mailing a notice to an employee's last known address has been held to qualify as a good faith attempt to satisfy the Act and courts have not generally required the employer or plan administrator to ensure that actual notice is received. *Id.* ("[T]he issue is not whether the former employee actually received notice; the issue is whether the plan administrator 'caused the notice to be sent in a good faith manner reasonably calculated' to reach the former employee."); *see also Smith*, 128 F.3d at 1383 (10th Cir. 1997)(collecting cases); *Degruise v. Sprint Corp.*, 279 F.3d 333, 336 (5th Cir. 2002).

Here, it is undisputed that Adidas notified its plan administrator, Great-West, of Turner's qualifying event, as required by the Act. It is further undisputed that Great-West sent a COBRA notice dated June 30, 2006, advising Turner of his right to continuing benefits, to his last known address. (Pl. LR 56.1 Resp. ¶ 28(b)). Turner denies that he ever received the letter, but he admits that he received prior mailings from Great-West at that same address and that he was not regularly checking his mail at that address at the time. (*See* Pl. Memorandum in Response to Def.'s Motion

15

for Summary Judgment at 14; Pl. LR 56.1 Resp. ¶¶ 29, 30.) Adidas has presented unrebutted evidence of its own and its plan administrator's good faith efforts to comply with COBRA's notice requirements by causing notice of continuing benefits to be sent to Turner's last known address. Adidas's Motion for Summary Judgment dismissing Turner's COBRA claim is therefore granted.

**Count III: Intentional Infliction of Emotional Distress**

In Count III, Turner alleges intentional infliction of emotional distress ("IIED") regarding the manner Adidas chose to terminate his employment. Adidas has moved for summary judgment on Turner's claim for IIED, arguing that it is preempted by the Illinois Worker's Compensation Act, 820 ILCS 305/5(a) ("IWCA") or, alternatively, that Turner has failed to state a cause of action for IIED.

When an injury occurs in the workplace, the Illinois Workers' Compensation Act, 820 ILCS 305/1 *et seq.*, provides the exclusive remedy for accidental injuries. *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1016 (7th Cir.1997). Under the Act, an employee has no right to recover damages from the employer or its agents or employees for accidental injuries incurred in the course of employment. *Id.*; 820 ILCS 305/5(a) and 305/11. To avoid preemption by the IWCA, Turner therefore must establish one of the following: "(i) the injury was not accidental, (ii) the injury did not arise from [his] employment, (iii) the injury was not received during the course of [his] employment, or (iv) the injury is not compensable under the Act." *Id.* (citing *Meerbrey v. Marshall Field and Co.*, 139 Ill.2d 455, 463, 564 N.E.2d 1222 (1990).

The parties have devoted attention to whether Turner can make this showing, but the court concludes it need not decide the question. To establish a claim of intentional infliction of emotional distress, Turner would have to prove (a) extreme and outrageous conduct; (b) an intent on the part of Adidas to cause or reckless disregard for the probability of emotional distress; (c) that he suffered severe or extreme emotional distress; and (d) that the outrageous conduct was the cause. *Hunt-Golliday*, 104 F.3d at 1016, citing *Doe v. Calumet City*, 161 Ill. 2d 374, 392, 641 N.E.2d 498 (1994). Turner has failed to identify anyone at Adidas who acted "extremely or outrageously." Put simply,

termination of an employee pursuant to company policy is neither extreme nor outrageous. And Turner's claim that the timing of his discharge was particularly disturbing fell apart when he acknowledged that his baby was born months later than he had alleged.

The court therefore grants Adidas's motion for summary judgment on Count III of the complaint.

## **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment [35] is granted.

ENTER:

Dated: March 31, 2009

_____
REBECCA R. PALLMEYER
United States District Judge